# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

DANIEL HARRINGTON, an individual,
PAMELLA HARRINGTON, an individual,
NIGHTWATCH MARINE, LLC, a Nevada
limited liability company,

      Plaintiffs

v.

DAVID TACKETT,
an individual,

      Defendant

Case No.: 3:18-cv-00028-WGC

**Order**

Re: ECF No. 102

Before the court is Plaintiffs' Motion for Partial Summary Judgment. (ECF Nos. 102, 102-1 to 102-15.) The court entered a separate order striking defendant David Tackett's belated response (ECF No. 104). (Order at ECF No. 118.) For the reasons discussed below, Plaintiffs' motion is granted with respect to their breach of contract claim, but denied as to their fraud claim.

## I. BACKGROUND

### A. The Harrington Action

The second amended complaint (SAC) is the operative complaint in this action, which will frequently be referred to as the Harrington action. (ECF No. 100.) Plaintiffs' claims arise from an alleged contract the parties entered into for Tackett to purchase approximately 130,000 pounds of turquoise ore from the Harringtons, who subsequently assigned their rights to their wholly-owned limited liability company, Nightwatch Marine. The Harringtons had previously acquired the 130,000 pounds of turquoise ore under an agreement with the Ward Family Trust.

They assert claims for breach of contract, unjust enrichment (in the alternative), conversion and fraud/intentional misrepresentation against Tackett. Plaintiffs now seek partial summary judgment as to the first cause of action for breach of contract and the fourth cause of action for fraud/intentional misrepresentation. They seek rescission of the contract under either theory. As was referenced above, defendant Tackett's belated response to the motion has been stricken. (ECF No. 118.)

The court will now discuss some additional background information that is relevant to the court's determination of this motion.

**B. The Jennings/Fournier Action**

In 2009, Elven Jennings and Richard Fournier filed an action against Fay Ward, as an individual and as trustee of the Ward Family Trust, Bryan S. Mason, L. Jane Mason, Silver & NV Stones, LLC, and others, in case 3:07-cv-00230-LRH-RAM (the Jennings/Fournier action). Jennings and Fournier alleged that they entered into a contract with Ward in 2005 whereby she sold them 400 tons of chalk turquoise that originated from the No. 8 Mine, and Ward agreed not to sell any turquoise from the No. 8 Mine to any purchaser other than Jennings and Fournier.

In their lawsuit, Jennings and Fournier claimed that the defendants unreasonably restricted access to the turquoise, and removed turquoise that had been sold to them from warehouses and allowed it to be sold to others.

Fay Ward was eventually dismissed with prejudice pursuant to stipulation. (ECF No. 166 in 3:07-cv-00230-LRH-RAM.) In addition, a permanent injunction was entered by consent whereby the Masons, Silver & NV Stones, LLC, and all persons or entities acting in concert with them, agreed that they would not transact in turquoise from the No. 8 mine. (ECF No. 170 in 3:07-cv-00230-LRH-RAM.)

**C. The No. 8 Mine Action**

The Harringtons filed this action against Tackett on January 17, 2018. Shortly after the Harringtons filed their action, No. 8 Mine, LLC, which is a limited liability company owned by Tackett, filed a complaint in State court on February 2, 2018, which was then removed to this court on March 6, 2018 (the No. 8 Mine action). (ECF Nos. 1, 1-1 at 3:18-cv-00104-WGC.)

No. 8 Mine, LLC, sued the Eljen Group, LLC, Elven Jennings, Jack Elkins, Frank Lente and Steve Harper (subsequently referred to as the Eljen parties), alleging that on May 17, 2017, the Eljen parties entered into an agreement with No. 8 Mine to purchase approximately 280,000 pounds of No. 8 turquoise (which refers to turquoise mined from the No. 8 Mine). No. 8 Mine, LLC, contends that it took possession of the turquoise and moved it to a facility in Flagstaff, Arizona, with the exception of 64,000 pounds of the turquoise, which the parties agreed would be held at a storage facility in Winnemucca, Nevada. No. 8 Mine, LLC, claims that the Eljen parties acted to convert the 64,000 pounds of turquoise stored in Winnemucca through an agreement whereby Eljen/Jennings purported to sell that turquoise to Elkins, Lente and Harper, and Elkins, Lente and Harper subsequently sold 10,000 of the 64,000 pounds to a buyer in Arizona. No. 8 Mine, LLC, avers that the 10,000 pounds of turquoise was sold at twenty percent of market price, undercutting the market for No. 8 Mine's sale of the remaining turquoise. (ECF No. 1-1 in 3:18-cv-00104-WGC.)

The Eljen parties filed counterclaims against No. 8 Mine, as well as third party claims against Tackett and others. The Eljen parties allegations pertain to: (1) the 280,000 pounds of turquoise ore discussed in No. 8 Mine's complaint; and (2) an additional 130,000 pounds of turquoise ore that Jennings claims was sold to him and his then-partner, Fournier, by Fay Ward (and was part of the deal between Jennings and Fournier and Ward discussed above).

As to the latter category of turquoise, the Eljen parties allege that the agreement between Jennings/Fournier and Ward provided that Jennings and Fournier purchased all useable, treatable No. 8 mine chalk turquoise in burlap bags located in warehouse buildings B and C for $2,000,000 to be paid in installments over eight years. There was an amendment to the agreement in 2006, stating that Jennings/Fournier could remove all the turquoise they wanted from the warehouses at $5,000 per pound, provided they continued to pay a minimum of $10,000 per month. They contend that they were allowed to sort through the turquoise, take what they wanted, and discard the unsuitable materials which would revert to the sellers. While they were sorting through the turquoise, Jennings and Fournier discovered that several tons of turquoise in burlap sacks had been unlawfully removed from the warehouse buildings. They suspected the Masons and others were taking sacks of turquoise and hiding them. As was referenced above, Jennings and Fournier filed a lawsuit against Ward, the Ward Family Trust, the Masons and others, and an injunction issued in that case which precluding the Masons and persons acting in concert with them from selling or otherwise transacting in No. 8 turquoise. Jennings assigned his rights in that litigation to himself, and Elkins, Lente and Harper. According to the Eljen parties, Fay Ward testified in her deposition that all of the No. 8 turquoise mined by her deceased husband was in warehouses B and C, and Jennings and Fournier had the exclusive rights to purchase it.

The Eljen parties contend that contrary to representations made in the Jennings/Fournier case, some of the defendants in that case retained control over turquoise that was stolen from Jennings and Fournier, and then marketed and sold it to third parties, including Tackett/No. 8 Mine, LLC. Specifically, they allege that the 130,000 pounds of turquoise that Tackett bought from the Harringtons was part of the turquoise stolen from Jennings/Fournier.

**D. Limited Consolidation of the Harrington and No. 8 Mine Actions**

The Harrington and No. 8 Mine actions were consolidated briefly for the limited purpose of taking discovery and filing dispositive motions on the issue of ownership of the 130,000 pounds of turquoise when it was acquired by the Harringtons from the Ward Family Trust. (ECF No. 70 in 3:18-cv-00028-WGC; ECF No. 95 in 3:18-cv-00104-WGC.)

On October 16, 2019, a stipulation was filed by the Harringtons/Nightwatch, and the Eljen parties, concerning the limited issue of consolidation: the disputed ownership of the 130,000 pounds of turquoise. The stipulation references an affidavit that Jennings filed in support of a motion for preliminary injunction. In that affidavit, Jennings said that he was "certain that the No. 8 turquoise that David Tackett claims to have purchased from the Harringtons is turquoise that is subject to the Injunction entered in Cause No. 3:07-cv-230-LRH-RAM" and that Jennings knew this because he "purchased all of the No. 8 turquoise, and the only thing left in Fay Ward's warehouse after [his] purchase was low quality, non-marketable rock[.]" The affidavit also said that Tackett represented to Jennings that the Harringtons had purchased Fay Ward's warehouse and No. 8 turquoise in the warehouse. Jennings stated that this could not be because Fay Ward testified in a deposition in case 3:07-cv-230-LRH-RAM, that she did not possess any No. 8 turquoise beyond what she sold to Jennings (and Fournier). Jennings went on to state that no one else could have lawfully possessed the No. 8 turquoise because the Masons and persons acting in concern them were subject to the injunction that prohibited them from selling or otherwise transacting in the No. 8 turquoise. (ECF No. 86 at 5 in 3:18-cv-00028-WGC; ECF No. 126 at 5 in 3:18-cv-00104-WGC.)

Despite Jennings' statements, the Harringtons and Eljen parties stated in the stipulation that as part of the consolidated discovery process, they reviewed documents and evidence related

5

to the disputed ownership and based on that evidence and their discussions concerning the issue, they stipulated that the Eljen parties would withdraw their claims of ownership of the Harrington turquoise, and conceded that it was not subject to the injunction entered in the Jennings/Fournier action. They further stipulated that the Ward Family Trust owned the Harringtons' turquoise when it was conveyed to the Harringtons. (ECF Nos. 86, 87 in 3:18-cv-00028-WGC; ECF Nos. 126, 127 in 3:18-cv-00104-WGC.)

**E. Stipulated Preliminary Injunction in the Harrington and No. 8 Mine Actions**

The parties in the Harrington and No. 8 Mine actions stipulated to a global preliminary injunction that: No. 8 Mine, LLC, Tackett, the Eljen parties, as well as the Harringtons and Nightwatch, would not dispossess any of the No. 8 turquoise or silver bars in dispute in the two cases pending further order of the court. (*See* ECF Nos. 76, 77 in 3:18-cv-00028-WGC*; ECF Nos. 104 and 105, in 3:18-cv-00104-WGC.)

## II. LEGAL STANDARD

The legal standard governing this motion is well settled: a party is entitled to summary judgment when "the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Cartrett*, 477 U.S. 317, 330 (1986) (citing Fed. R. Civ. P. 56(c)). An issue is "genuine" if the evidence would permit a reasonable jury to return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). A fact is "material" if it could affect the outcome of the case. *Id*. at 248 (disputes over facts that might affect the outcome will preclude summary judgment, but factual disputes which are irrelevant or unnecessary are not considered). On the other hand, where reasonable minds could differ on the material facts at issue, summary judgment is not appropriate. *Anderson*, 477 U.S. at 250.

1    "The purpose of summary judgment is to avoid unnecessary trials when there is no

2    dispute as to the facts before the court." *Northwest Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18

3    F.3d 1468, 1471 (9th Cir. 1994) (citation omitted); *see also Celotex,* 477 U.S. at 323-24 (purpose

4    of summary judgment is "to isolate and dispose of factually unsupported claims"); *Anderson,* 477

5    U.S. at 252 (purpose of summary judgment is to determine whether a case "is so one-sided that

6    one party must prevail as a matter of law"). In considering a motion for summary judgment, all

7    reasonable inferences are drawn in the light most favorable to the non-moving party. *In re*

8    *Slatkin*, 525 F.3d 805, 810 (9th Cir. 2008) (citation omitted); *Kaiser Cement Corp. v. Fischbach*

9    *& Moore Inc.*, 793 F.2d 1100, 1103 (9th Cir. 1986). That being said, "if the evidence of the

10   nonmoving party "is not significantly probative, summary judgment may be granted." *Anderson,*

11   477 U.S. at 249-250 (citations omitted). The court's function is not to weigh the evidence and

12   determine the truth or to make credibility determinations. *Celotex,* 477 U.S. at 249, 255;

13   *Anderson*, 477 U.S. at 249.

14   In deciding a motion for summary judgment, the court applies a burden-shifting analysis.

15   "When the party moving for summary judgment would bear the burden of proof at trial, 'it must

16   come forward with evidence which would entitle it to a directed verdict if the evidence went

17   uncontroverted at trial.'… In such a case, the moving party has the initial burden of establishing

18   the absence of a genuine [dispute] of fact on each issue material to its case." *C.A.R. Transp.*

19   *Brokerage Co. v. Darden Rest., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (internal citations

20   omitted). In contrast, when the nonmoving party bears the burden of proving the claim or

21   defense, the moving party can meet its burden in two ways: (1) by presenting evidence to negate

22   an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving

23

party cannot establish an element essential to that party's case on which that party will have the burden of proof at trial. *See Celotex Corp. v. Cartrett*, 477 U.S. 317, 323-25 (1986).

If the moving party satisfies its initial burden, the burden shifts to the opposing party to establish that a genuine dispute exists as to a material fact. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The opposing party need not establish a genuine dispute of material fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of truth at trial." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987) (quotation marks and citation omitted). The nonmoving party cannot avoid summary judgment by relying solely on conclusory allegations that are unsupported by factual data. *Matsushita*, 475 U.S. at 587. Instead, the opposition must go beyond the assertions and allegations of the pleadings and set forth specific facts by producing competent evidence that shows a genuine dispute of material fact for trial. *Celotex*, 477 U.S. at 324.

### III. DISCUSSION

**A. Facts**

Plaintiffs set forth the following statement of undisputed facts:

The Harringtons are husband and wife and Nightwatch Marine, LLC, is their wholly-owned limited liability company. On October 30, 2015, they entered into an agreement to purchase real and personal property in Crescent Valley, Nevada, from the Ward Family Trust. (Daniel Harrington Decl. at ECF No. 102-3 ¶ 2; ECF No. 102-4.) This included the purchase of warehouse buildings located on the real property, and approximately 130,000 pounds of turquoise ore that was located in the warehouse buildings. (Daniel Harrington Decl., ECF No. 102-3 ¶¶ 3-4.) In an addendum, the Harringtons assigned their rights under the agreement to

Nightwatch. (Daniel Harrington Decl., ECF No. 102-3 ¶ 5.) The sale closed on or before October 31, 2016. (*Id. ¶* 6.)

On or about January 10, 2017, the Harringtons told an individual named Bill Cook about the turquoise ore. (Pamella Harrington Decl., ECF No. 102-2 at 1 ¶ 2; Daniel Harrington Decl., ECF No. 102-3 ¶ 8; Answer to SAC., ECF 101 ¶ 8.) The Harringtons and Mr. Cook contemplated entering into a partnership to sell the turquoise ore. (Pamella Harrington Decl., ECF No. 102-2 at 1 ¶ 3; Daniel Harrington Decl., ECF No. 102-3 ¶ 9.) The partnership was never formed, but Mr. Cook took it upon himself to contact potential buyers who might be interested in purchasing the turquoise ore, including Tackett in July of 2017. (Daniel Harrington Decl., ECF No. 102-3 ¶ 10; SAC, ECF No. 100 ¶ 15; ECF No. 101 ¶ 8 (admitting the allegations of the SAC in ¶ 15).) Tackett paid $36,200 for one sack of the turquoise ore. (Daniel Harrington Decl., ECF No. 102-3 ¶ 11.)

On August 24, 2017, David Tackett contacted the Harringtons to inquire about purchasing the turquoise ore, and Tackett came to the Harringtons' home with his father, Steven Tackett, the next day. (*Id.* ¶¶ 12-14.) For the first time, Tackett claimed to the Harringtons that he actually owned the turquoise ore they had purchased from the Ward Family Trust. (*Id.* ¶ 16, ECF No. 102-12 at 32:7-10; ECF No. 102-13 at 7:22-24 8:5-6, 30:16-19, 36:21-25- 39:21.)[1] The Harringtons told Tackett this was incorrect, and that they were the rightful owners of the turquoise ore pursuant to their agreement with the Ward Family Trust. (Daniel Harrington Decl., ECF No. 102-3 ¶ 17; ECF No. 102-13 at 36:21-24.) Tackett told the Harringtons he had purchased the turquoise ore from the "Eljen Estate." (Daniel Harrington Decl., ECF No. 102-3

---

[1] The page number reference is to the ECF page number and not the transcript page number; however, the line numbers correspond with the line numbers on the transcript of the ECF page number cited.

¶ 18(1); ECF No. 102-13 at 46.) The Eljen parties, however, have stipulated that the Ward Family Trust owned the turquoise ore at the time it was conveyed to the Harringtons. (ECF No. 87 at 4.)[2]

Tackett also represented to the Harringtons he "owned" a federal injunction pertaining to the turquoise ore, and represented he could produce documents to the Harringtons proving his title or ownership in the turquoise ore. (Daniel Harrington Decl., ECF No. 102-3 ¶ 18(2), (3).) In addition, Tackett threatened the Harringtons that they would end up in court if they did not sell the turquoise ore to Tackett. (Daniel Harrington Decl., ECF No. 102-3 ¶¶ 19-20.)

Based on these representations, on August 25, 2017, the Harringtons orally offered to sell Tackett all of the turquoise ore in exchange for payment of $300,000, and future payments of $20 per pound of any of the Harringtons' turquoise ore that Tackett sold. (Pamella Harrington Decl., ECF No. 102-2 at 4 ¶ 12; Daniel Harrington Decl., ECF No. 102-3 ¶ 21.)[3] The Harringtons and Tackett prepared and signed a written agreement memorializing their oral agreement. (Daniel Harrington Decl., ECF No. 102-3 ¶ 24; ECF No. 102-5.)

The Harringtons relied on Tackett's promise to pay the $300,000 when they agreed to let Tackett take possession of the 48 sacks of turquoise ore. (Pamella Harrington Decl., ECF No. 102-2 at 4 ¶ 13; Daniel Harrington Decl., ECF No. 102-3 ¶ 22.)

Immediately after the written agreement was signed, Tackett called three semi-trucks to pick up the turquoise ore at the Harringtons' home. (Pamella Harrington Decl., ECF No. 102-2 at

---

[2] This refers to the stipulation entered into by the Eljen Parties and the Harringtons/Nightwatch following the limited consolidation of the Harrington and No. 8 Mine actions to conduct discovery and file dispositive motions related to the ownership of the 130,000 pounds of turquoise the Harringtons acquired from the Ward Family Trust.

[3] It appears according to the transcripts and written agreement that the Harringtons' turquoise was estimated to be 10 percent of the total No. 8 turquoise Tackett possessed.

1   4 ¶ 14; Daniel Harrington Decl., ECF No. 102-3 ¶ 23, CF No. 102-6, Tackett's amended response

2   to Plaintiffs' first set of interrogatories, Nos. 2, 4.)

3          Later that day, after he had taken possession of the turquoise ore, Tackett claimed he

4   could not pay the Harringtons the $300,000 he owed them because the banks were closed.

5   (Daniel Harrington Decl., ECF No. 102-3 ¶ 26.) He told the Harringtons to meet him at a Wells

6   Fargo bank the next day. (*Id.* ¶ 27.) The Harringtons agreed to do so; however, Tackett did not

7   show up to meet the Harringtons the next day. (*Id.* ¶¶ 28-29). Tackett has not paid the

8   Harringtons the agreed upon $300,000. (*Id.* ¶ 30; ECF No. 102-8 at 2.) He has only paid the

9   Harringtons $20,000, which the Harringtons state was their cost of bagging and sorting the

10  turquoise ore. (Daniel Harrington Decl., ECF No. 102-3 ¶ 31.)[4]

11  **B. Breach of Contract**

12          "Under Nevada law, 'the plaintiff in a breach of contract action [must] show (1) the

13  existence of a valid contract, (2) a breach by the defendant, (3) and damage as a result of the

14  breach.'" *Rivera v. Peri & Sons Farms, Inc.,* 735 F.3d 892, 899 (9th Cir. 2013) (quoting *Saini v.*

15  *Int'l Game Tech.,* 434 F.Supp.2d 913, 919-20 (D. Nev. 2006)). For an enforceable contract to

16  exist, there must be an offer and acceptance, meeting of the minds and consideration. *May v.*

17  *Anderson*, 121 Nev. 668, 672, 119 P.3d 1254, 1257 (2005). "A meeting of the minds exists when

18  the parties have agreed upon the contract's essential terms." *Certified Fire Prot., Inc. v. Precision*

19  *Constr., Inc.*, 128 Nev. 371, 283 P.3d 250, 255 (2012). Consideration requires something that is

20  "bargained for and given in exchange for an act or promise." *Zhang v. Eighth Judicial Dist. Ct.*,

21

22

---

23  [4] As will be discussed below, other evidence submitted by Plaintiffs indicate that the $20,000
    paid by Tackett was a down payment toward the $300,000 he promised to pay for the turquoise
    ore.

120 Nev. 1037, 103 P.3d 20, 24 n. 11 (2004), *abrogated on other grounds by Buzz Stew, LLC v. City of North Las Vegas*, 124 Nev. 224, 181 P.3d 679 (2008).

A "[b]reach of contract is the material failure to perform 'a duty arising under or imposed by [an] agreement.'" *State of Nevada Dep't of Trans. v. Eighth Judicial Dist. Ct.*, 133 Nev. 549, 554, 402 P.3d 677 (2017) (quoting *Bernard v. Rockhill Dev. Co.*, 103 Nev. 132, 135, 734 P.2d 1238, 1240 (1987)).

Plaintiffs have presented evidence that they entered into a valid contract with Tackett: they offered to sell Tackett all the turquoise in their possession (approximately 48 sacks of 130,000 pounds of turquoise, plus two additional sacks at a different location and turquoise ore needing to be collected from the ground) in exchange for Tackett's payment of $300,000 as well as future payments at $20 per pound for sales of the Harringtons' turquoise until the turquoise is exhausted. In addition, they have presented evidence that Tackett materially breached the agreement: Tackett took possession of the turquoise ore, but failed to pay Plaintiffs as agreed (other than $20,000 that Plaintiffs state was the cost of sorting and bagging the turquoise ore). Finally, Plaintiffs have presented evidence that they were damaged as a result of the breach: they were dispossessed of the turquoise ore without receiving the agreed upon payment.

Plaintiffs anticipated that Tackett would argue that he believed he did not have to pay Plaintiffs until he began to sell the turquoise ore. Tackett's response has been stricken, and no such argument is before the court. In any event, if the contract's terms do not make time for performance of the essence, and the contract does not set a time for performance, "a contract must be performed within a reasonable time" which is "determined based on the nature of the contract and the circumstances surrounding its making." *Mayfield v. Koroghli,* 124 Nev. 343, 346, 349, 184 P.3d 362 (2008) (citations omitted). "[W]hen a contract does not make time of the

essence, one party to the contract may make it so by demanding performance by a certain date or time, so long as the party fixe[es] a reasonable time for the completion of the contract and giv[es] notice to the other party of an intention to abandon the contract unless it is completed within the specified time." *Id.* at 349 (citations and internal quotation marks omitted, alteration original). "In so doing, the time for a party's performance becomes a material term of the contract, so that the failure to perform by the time specified usually constitutes and has the legal effect of a material breach." *Id.* (citations omitted).

Here, the evidence demonstrates that the parties had agreed that Tackett was going to pay Plaintiffs the day they entered into the contract, but he then represented he was unable to do so because by the time they had entered into the agreement, the bank was closed. Then, Tackett agreed to meet the Harringtons the following day at the Wells Fargo bank in Winnemucca, Nevada, in order to effectuate the payment; however, Tackett never did so. Then, Tackett was apparently sued and convinced the Harringtons that they needed to "lay low" to see how the new litigation played out and whether the Harringtons would be brought into the lawsuit. (*See* ECF Nos. 102-8, 102-9.)

On October 26, 2017, however, Daniel Harrington sent Tackett a text message stating they "would like to wrap this up. It has been two months since you took possession of the ore. I have attached bank wire information." (ECF No. 102-8 at 2.) Tackett responded: "Yes thank you." (*Id.*) On November 2, 2017, Daniel Harrington texted Tackett: "Hello David, we have not received any funds for the turquoise into our account yet. We are in need of it for our house. Can you confirm wire date. Thanks, Dan." (ECF No. 102-8 at 2.)

1   Apparently Tackett did not respond, and on December 7, 2017, Daniel Harrington sent

2   Tackett a letter that offered Tackett one last chance to pay them for the turquoise ore within

3   fourteen days or the Harringtons would institute legal proceedings. (ECF No. 102-9.)

4   On December 28, 2017, Daniel Harrington sent Tackett another text:

5   Per demand letter, if no payment or return of ore by Jan 3 confirms
    intent to defraud. All evidence we have amassed will be turned
6   over to law enforcement for investigation of theft, fraud, extortion,
    and possibly racketeering. All with mandatory jail time if
7   convicted. The choose [sic] is yours. Let us know if you need
    account wire information again. Happy new year.
8
    (ECF No. 102-8 at 2.)
9
    On January 3, 2018, Tackett sent Daniel Harrington a text:
10
11  I will have an answer to you shortly things have not been easy to
    work on this end either. We are doing the best we can to work
    through everything we appreciate your patience. It is never as
12  much fun to pursue things legally as it is to work things out if you
    wish to pursue things legally I will ask that you send the
13  paperwork to the [Eljen] group the rightful owners of the sone as
    well as me the buyer of the [Eljen] estate, thank you again for your
14  patience as soon as we know anything we will keep you informed.

15  (*Id.*)

16  As of the time the motion for partial summary judgment was filed, Tackett had not paid

17  Plaintiffs for the turquoise ore, other than the $20,000. (Pamella Harrington Decl., ECF No. 102-

18  2 ¶¶ 21-22; Daniel Harrington Decl., ECF No. 102-3 ¶¶ 30, 31.)

19  Tackett did not pay the remaining $280,000 within a reasonable period of time after

20  entering into the agreement and taking possession of the turquoise. Nor did Tackett pay by the

21  deadline imposed by Daniel Harrington under the December 7, 2017 letter. Therefore, Tackett

22  materially breached the agreement.

23  As a result, summary judgment will be granted in Plaintiffs' favor and against Tackett on

the breach of contract claim. The court will address the requested remedy of rescission, *infra*.

14

**C. Fraudulent Inducement**

    **1. Legal Standard**

    To prevail on a claim for fraudulent inducement a plaintiff must demonstrate by clear and convincing evidence: (1) a false representation made by the defendant; (2) the defendant's knowledge or belief that the representation was false, or knowledge that there was an insufficient basis for making the representation; (3) the defendant's intention to induce the plaintiff to consent to formation of the contract; (4) the plaintiff's justifiable reliance on the misrepresentation; and (5) damage to the plaintiff resulting from such reliance. *A. Jones Constr. Co. v. Lehrer McGovern Bovis, Inc.*, 89 P.3d 1009, 120 Nev. 277, 290 (2004). There is never a presumption of fraud, and it must be "clearly and satisfactorily proved." *Id.* (citation omitted).

    **2. Plaintiffs' Argument**

    Plaintiffs contend that Tackett represented to them that: (a) he had an ownership interest in the turquoise ore that he could prove with documentation; (b) he would pay Plaintiffs $300,000 after he took possession of the turquoise; and (c) that Plaintiffs would end up in litigation with third parties unless they sold Tackett the turquoise.

    They assert that Tackett knew these representations were false when made, and that he intended to induce Plaintiffs to rely on these misrepresentations. First, they contend that his bank accounts demonstrate he did not have sufficient funds to comply with his representations, and argue this is probative of his intent to never pay for the turquoise. Second, Plaintiffs assert that the Eljen parties conceded that the Ward Family Trust owned the turquoise ore when it was conveyed to Plaintiffs, and the Eljen parties never purported to sell an interest in the turquoise

ore  to Tackett. Third, they assert that if Tackett genuinely believed he owned the turquoise ore, he would not have contracted to pay Plaintiffs for it.

Next, Plaintiffs claim that they relied on Tackett's misrepresentations and provided him with the turquoise based on these representations. They maintain the reliance was justified because Tackett had previously paid $36,200 for a single sack of turquoise.

Finally, they contend they suffered damages as a result of their reliance because Tackett is in possession of the turquoise ore and has not paid Plaintiffs.

As with the breach of contract claim, Plaintiffs request the remedy of rescission, and assert that Tackett must bear the costs of returning the turquoise to Plaintiffs in Crescent Valley, Nevada, and argue that he not recover the shipping costs he previously incurred when he took the turquoise from Plaintiffs via semi-trucks.

**3. Analysis**

### a. Tackett's Representation that he Owned the Turquoise

First, it is undisputed that Tackett represented he had an ownership interest in the turquoise that he could prove with documentation, as this representation appears in the written agreement itself: "David Tackett will be providing documentation from the courts that he is rightful owner of rock & this agreement will provide amnesty to any claims against Harringtons." (ECF No. 102-5.) Plaintiffs also provide transcripts of conversations with Tackett, where he also made this representation several times. (*See* ECF No. 102-11 at 65:5-16; ECF No. 102-12 at 28:7-17, 30:18-21, 32:6-11, 34:7-25, 35:1-5; ECF No. 102-13:7:17-10:12; 29:16-30:21, 36:17-39:21, 45:24-51:9, 55:1-6.)

The question is whether Plaintiffs have submitted clear and convincing evidence to demonstrate Tackett knew this representation was false when he made it or that there was an

insufficient basis for making the representation, and that by making the representation he intended to induce Plaintiffs into entering into the agreement with him.

To support their argument that Tackett knew this was false, Plaintiffs point to the fact that the Eljen parties conceded that the Ward Family Trust owned the turquoise ore when it was conveyed to Plaintiffs. They also assert that the Eljen parties never purported to sell their interests to Tackett. Plaintiffs rely on the stipulation into with the Eljen parties following the limited consolidation of the Harrington and No. 8 Mine actions, discussed *supra*.

To reiterate, the Eljen parties alleged in the No. 8 Mine case that they owned the turquoise ore at issue in the Harrington case. Following the limited consolidation of the two actions, the Eljen parties stipulated to withdraw their claim of ownership of the Harrington turquoise ore, conceding that the Ward Family Trust owned the approximately 130,000 pounds of turquoise ore that the Harringtons purchased. The Eljen parties further stipulated that the turquoise the Harringtons purchased from the Ward Family Trust was not subject to the injunction entered in case 3:07-cv-00230-LRH-RAM. (ECF No. 87.)

The fact that the Eljen parties entered into a stipulation in October of 2019 with the Harringtons about the turquoise ore that the Harringtons purchased from the Ward Family Trust does *not* demonstrate what *Tackett* knew about the source of the Harringtons' turquoise when he agreed to purchase it in 2017. In fact, the stipulation confirms that the Eljen parties initially claimed they were the rightful owners of the Harringtons' turquoise. (ECF No. 87 at 4-5.) Moreover, the stipulation acknowledges that Jennings testified in an affidavit that he was certain that the turquoise Tackett claimed to have purchased from the Harringtons was turquoise subject to the injunction in the Jennings/Fournier action. (*Id.* at 5.) The stipulation says nothing about

1   Tackett's claim of an ownership interest in the turquoise when he negotiated to purchase it from

2   the Harringtons in August of 2017.

3          Instead, Tackett consistently said in the transcript of the conversations between the

4   parties leading up to the agreement that he owned the turquoise because he had purchased the

5   turquoise from the Eljen parties, as well as any rights they had under the injunction in the

6   Jennings/Fournier action.

7          Plaintiffs also argue that common sense dictates that Tackett would not contract to

8   purchase something he did not own. While one would think that would be the case, Tackett

9   explained that he was paying the Plaintiffs so he did not have to take them to court to determine

10  he was the rightful owner of the turquoise ore the Harringtons possessed. (*See* ECF No. 102-13

11  at 7:17-10:12, 45:24-51:9; ECF No. 102-8 at 2.)

12         Other evidence submitted by Plaintiffs also reflects Tackett's position that he was the

13  owner of the turquoise ore. Plaintiffs provide Tackett's amended responses to their first set of

14  interrogatories, where Tackett explained his position: he asserted that Faye Ward testified in her

15  deposition in 3:07-cv-00230-LRH-RAM, that all of the No. 8 rough turquoise mined by her late

16  husband was in warehouses B and C, and that she had given the Masons authority to sell it on her

17  behalf, and Jennings and Fournier had the exclusive right to purchase the No. 8 turquoise.  He

18  went on to state that the Harringtons claim to have acquired property from the Ward Family

19  Trust, including warehouses containing the 130,000 pounds of No. 8 turquoise. Tackett

20  maintained that whether the Plaintiffs' No. 8 turquoise came from the warehouses or from burlap

21  sacks buried on the property, Jennings had examined the turquoise Tackett obtained from the

22  Harringtons and Jennings had determined it was part of the No. 8 turquoise that he and Fournier

23  had acquired from the Ward Family Trust. Tackett went on to explain that he and his company,

No. 8 Mine, LLC, entered into a purchase agreement with Jennings and the Eljen parties on June 16, 2017, roughly two months before the encounter with the Harringtons, where Tackett/No. 8 Mine purchased all the turquoise that Jennings/Eljen parties had purchased from the Ward Family Trust. In addition, Tackett states that Jennings/Eljen parties assigned him and No. 8 Mine, LLC, all rights arising in the litigation initiated by Jennings and Fournier against Ward and the Masons in case 3:07-cv-00230-LRH-RAM, including all rights they had under the injunction dated June 23, 2009, which encompasses the right to enforce the injunction or bring a claim for damages. (ECF No. 102-6 at 9.)

This is consistent with the statements Tackett made on the date he entered into the agreement with the Harringtons. While the Eljen parties subsequently disavowed any ownership interest in the turquoise that the Harringtons acquired from the Ward trust, this does not demonstrate that Tackett knew in August of 2017 when he was negotiating with the Harringtons that he did not own or have rights to the Harringtons' turquoise. Moreover, while Plaintiffs state that the Eljen parties claim they never purported to sell any interest to Tackett, that is not contained within the stipulation. Nor have Plaintiffs submitted any other evidence that reflects this position.

In sum, Plaintiffs have not presented clear and convincing evidence that Tackett knew his representation that he owned the turquoise was false or that there was an insufficient basis for making the representation.

### b. Tackett's Representation that He Could Pay Plaintiffs

Second, the Plaintiffs contend that Tackett represented he would pay Plaintiffs $300,000 after he took possession of the turquoise, but he did not in fact have the means to pay the

$300,000. To support this argument, Plaintiffs point to bank account statements produced in discovery.

Mr. and Mrs. Harrington both state in their declarations that Tackett represented he would pay $300,000 (plus some future payments based on sales) in exchange for the turquoise, and that he would go to the Wells Fargo bank the next day because the banks were closed that day, but he did not do so. (Pamella Harrington Decl., ECF No. 102-2 ¶¶ 12-20; Daniel Harrington Decl., ECF No. 102-3 ¶¶ 22-29.) That Tackett said he would go to the Wells Fargo the next day is also reflected in the transcript of the conversation between the parties. Mrs. Harrington asked, "So, we're gonna go with you to Wells Fargo tomorrow?" Tackett responded: "Uh-hmm. I hope, unless you just want to give me an account number." Mrs. Harrington replied, "No. We'll go. … We'll go to Wells Fargo with you. Wow, so the trucks are, like, gonna be here anytime. I don't even know what time it is." (ECF No. 102-12 at 37:24-25, 38:1-3, 38:19-21.) Daniel Harrington also sent a text message to Tackett the morning of August 26, 2017, asking about going to Winnemucca. Tackett responded that "yesterday was hard on [him" and to give him some time; however, there was no further real discussion from Tackett about meeting up, and the next message was not until Tackett sent a message checking in on September 15, 2017. (ECF No. 102-8.)

The question is whether Tackett knew his representation that he would pay $300,000 was false. Plaintiffs point to his bank statements as demonstrating an inability to pay the $300,000. Tackett produced bank statements from a Wells Fargo business checking account for American Bullion & Coin, LLC, dba A.B.C., from July 2017 to October 2017. (ECF Nos. 102-7, 102-10.) The records reflect that in August of 2017, when the agreement was made, there was a beginning balance of $65,887.92. Then, there were deposits and credits putting the account balance at

$321,757.55; however, withdrawals were made such that the ending balance at the end of the month was $1,198.54.

At one point, there was in excess of $300,000 in the account in August. It is unclear what withdrawals were made for. Nor is it clear whether Tackett had any other sources from which he had intended to pay the Plaintiffs. The court does not find there is clear and convincing evidence in the record that Tackett knew he could not pay the $300,000 based on these bank records alone.

### c. Tackett's Representation that Plaintiffs Would End Up in Litigation if they Did not Sell him the Turquoise

Finally, Plaintiffs assert that Tackett represented that they would end up in litigation with third parties if they did not sell him the turquoise.

The evidence suggests that Tackett represented, or at the very least implied, that Plaintiffs may end up in litigation if they did not enter into an agreement with him for the sale of the turquoise. It appears, however, that he represented that the alternative was for Tackett himself to sue them (as opposed to third parties) as he claimed ownership over the turquoise, and that even though he owned the turquoise, he was paying them so he did not have to take them to court. (*See* ECF No. 102-13 at 7:17-10:12.) Tackett's father said that if they went through the courts they could obtain a "stay" "on the material that basically prevents [the Plaintiffs] from selling it, it prevents [the Plaintiffs] from destroying it, prevents [the Plaintiffs] from doing anything with it until it's settled in court." Tackett said this could be years. Tackett's father went on to state that they did not want to "go down that kinda direction" and instead it was better for them to work together rather than paying lawyers. (ECF No. 102-13 at 16:14-17:7; *see also* ECF No. 102-13 at 22:9-24, 29:16-30:21.)

The recording transcripts submitted by Plaintiffs reflect that Tackett said: "I wouldn't give you money if I thought, you know, going to court would be easy." (ECF No. 102-11 at 5:8-10.) "It's horrible for everybody. And it's just better for me to play nice, come here -- …write a contract for you guys to get paid for helping me load up my turquoise and prove to you it's mine, and then everybody's happy." (*Id.* at 5:14-19.) His father said: "You know, the cheapest thing realistically -- just so you know the absolute truth, the cheapest thing is to not take you to court. The cheapest thing is to tie up the material legally for as long as we can and that doesn't take very much money. Going to court, actual court --…is expensive. But you know, there's five, ten years of manipulation that is just filing papers and whatnot--" (ECF No. 102-11 at 11.)

Plaintiffs do not point to any specific evidence which reflects that Tackett knew his representation about litigation was false or without sufficient basis. Instead, the evidence reflects that Tackett maintained that he had purchased the rights to the turquoise from the Eljen parties and that he was approaching Plaintiffs about the No. 8 turquoise they possessed so that he did not have to take them to court to make that determination.

While there might be some dispute over whether the Eljen parties did actually enter into an agreement with Tackett/No. 8 Mine, LLC, or as to the validity or scope of such an agreement, the Plaintiffs have not presented evidence of that here so as to constitute clear and convincing evidence of Tackett's knowledge of falsity of his representation or intent to fraudulently induce them into the agreement.

**4. Conclusion**

In conclusion, Plaintiffs' motion for partial summary judgment as to the fraud claim is denied. The court will now address the requested remedy of recission for the breach of contract claim.

**D. Rescission**

Plaintiffs assert that as a result of the breach of contract by Tackett, they are entitled to rescind the contract and be placed in their pre-contract position.

Under Nevada law, rescission based on a contractual breach "is an equitable remedy which totally abrogates a contract and which seeks to place the parties in the position they occupied prior to executing the contract." *Bergstrom v. Estate of DeVoe*, 109 Nev. 575, 854 P.2d 860, 861 (1993)). If a contract is rescinded, the contract no longer is enforceable. *See Awada v. Shuffle Master, Inc.*, 123 Nev. 613, 173 P.3d 707, 713 (Nev. 2007)). Whether to rescind the contract lies within the Court's discretion. *See Canepa v. Durham*, 65 Nev. 428, 198 P.2d 290, 294 (Nev. 1948)).

"A partial failure of performance of a contract will not give ground for its rescission unless it defeats the very object of the contract or renders that object impossible of attainment, or unless it concerns a matter of such prime importance that the contract would not have been made if default in that particular had been expected or contemplated." *Canepa*, 62 Nev. at 427, 153 P.2d at 903 (quotation marks and citation omitted).

Here, to the extent the payment of $20,000 by Tackett can render the failure to pay the remainder due as a partial failure of performance, the court finds that the partial failure was so substantial so as to defeat the object of the contract, and that rescission is an appropriate remedy for Tackett's breach of the agreement.

"Upon rescission, the parties should [be] returned as closely as possible to their respective positions prior to entering into the contract." *Bergstrom*, 854 P.2d at 862. When a party elects to rescind the contract, he must "return whatever value he has received under it[.]" *Id.* (citation and quotation marks omitted). "He cannot at the same time affirm the contract by

retaining its benefits and rescind by repudiating its burdens." *Id.* (citation and quotation marks omitted).

Here, the remedy of rescission would require the return of the turquoise ore taken by Tackett from the Harringtons. In addition, it requires that Plaintiffs' return the $20,000 payment made to them by Tackett. While Plaintiffs' now characterize the $20,000 payment made by Tackett as a sum for sorting and bagging the turquoise, as was noted above, Mr. Harrington's own communications to Tackett contradict that characterization and describe that as a down payment toward the $300,000 owed by Tackett.

Finally, Plaintiffs request that Tackett be responsible for any shipping costs incurred in returning the turquoise ore in connection with their *fraud* claim, but not the breach of contract claim. Therefore, the court will not address this request in the context of the breach of contract claim.

In conclusion, the court finds the Plaintiffs are entitled to rescind the contract. Tackett is required to return the turquoise ore taken from the Plaintiffs, and Plaintiffs are required to refund the 20,000 paid by Tackett.

## IV. CONCLUSION

Plaintiffs' motion for partial summary judgment (ECF No. 102) is **GRANTED** with respect to the breach of contract claim, and **DENIED** with respect to the fraud claim. Plaintiffs are entitled to rescind the contract as a remedy for Tackett's breach of the contract. Tackett is ordered to make arrangements to return the turquoise ore that is the subject of this action within **30 days** of the date of this Order. Plaintiffs similarly have **30 days** to return the $20,000 payment made to them by Tackett.

1      Within **14 days** of the date of this Order, Plaintiffs shall file a notice indicating the

2  impact of this Order on their remaining claims for unjust enrichment and conversion. Plaintiffs

3  shall also address the impact this Order has on the stipulated preliminary injunction. If it is

4  Plaintiffs' conclusion that this Order renders the remaining claims moot, the court will enter

5  judgment accordingly.

6  **IT IS SO ORDERED**.

7  Dated: September 24, 2020

8  _William G. Cobb_
   _____
   William G. Cobb

9  United States Magistrate Judge

10

11

12

13

14

15

16

17

18

19

20

21

22

23