1

2

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

3

4

5

6

7

8

9

DANIEL HARRINGTON,
PAMELLA HARRINGTON,
and NIGHTWATCH MARINE, LLC,

    Plaintiffs

v.

DAVID TACKETT,

    Defendant

Case No.: 3:18-cv-00028-WGC

**Order**

Re: ECF No. 165

10

11     Before the court is Plaintiffs' Motion for Order to Show Cause Why Defendant David

12  Tackett Should Not be Held in Contempt. (ECF Nos. 165, 165-1 to 165-15, manual filing noted

13  at ECF No. 166.) Defendant Tackett filed a response. (ECF No. 171.) Plaintiffs filed a reply.

14  (ECF Nos. 172, 172-1 to 172-10.)

15                           **I. BACKGROUND**

16     As the parties are aware, this case involves a dispute that stems from an agreement by

17  defendant Tackett to purchase No. 8 turquoise ore from Plaintiffs. Plaintiffs filed this action

18  alleging that Tackett took possession of the ore and had it shipped from Plaintiffs' property in

19  Crescent Valley, Nevada, to Tackett's facility in Flagstaff, Arizona, but then Tackett failed to

20  pay Plaintiffs the agreed upon amount.[1]

21     Early in the litigation, the parties stipulated, and the court ordered, that until ownership of

22  the subject ore was resolved, the parties desired to maintain the status quo regarding the

23

---

[1] It later came to light that Tackett made a payment of $20,000 as a down payment.

possession and condition of the subject ore, and so Tackett agreed to maintain the approximate 130,000 pounds of No. 8 turquoise in the covered storage at his business in Flagstaff throughout the pendency of this litigation. The parties were not to transfer, sell, or otherwise dispose of the subject ore in their respective possession throughout the pendency of the litigation. (ECF No. 20.)

This case was briefly consolidated with case 3:18-cv-00104-WGC (the No. 8 Mine case) to resolve the issue of who owned the 130,000 pounds of No. 8 turquoise ore when it was conveyed to the Harringtons. The Harringtons claimed they acquired it from the Ward Trust, while the Eljen Parties in the No. 8 Mine case claimed they acquired this same ore from the Ward Trust, and it was then wrongfully sold to the Harringtons. (*See* Order at ECF No. 70.)

In August of 2019, the parties to this case, as well as the parties in the No. 8 Mine case stipulated and the court entered a preliminary injunction where the parties agreed not to dispossess any of the No. 8 turquoise in dispute in these cases until further order of the court. This included the turquoise ore received by Tackett from the Harringtons in August 2017 that was in Tackett's possession. (ECF No. 77.)

After conducting discovery on the consolidated issue, in October of 2019, the Plaintiffs in this case and the Eljen Parties in the No. 8 Mine case stipulated that the Ward Trust owned the 130,000 pounds of No. 8 turquoise conveyed to the Harringtons, and the Eljen Parties withdrew their claims of ownership over that turquoise. As such, the consolidation of the two proceedings was terminated. (ECF No. 87.)

On March 31, 2020, Plaintiffs filed a motion for partial summary judgment as to their breach of contract and fraud/intentional misrepresentation claims, and sought rescission of the contract under either theory. (ECF No. 102.) No response was filed until May 29, 2020, more

than a month after the deadline. (ECF No. 104.) The response was silent about its untimeliness, and was not preceded by or accompanied with a motion for an extension of time to file the response. The court did not find that Tackett demonstrated excusable neglect for the late filing, and ordered the response stricken. (ECF No. 1188.)

The court then issued an order granting the motion for partial summary judgment as to the breach of contract claim, and denying it as to the fraud/intentional misrepresentation claim, and determined that Plaintiffs were entitled to rescission of the contract, *i.e.,* return of the turquoise ore at Tackett's expense. The court ordered Tackett to make arrangements to return the turquoise ore within 30 days, while Plaintiffs were obligated to return the $20,000 Tackett had paid within 30 days. (ECF Nos. 124, 133.)

On October 26, 2020, Plaintiffs filed a status report indicating that their counsel, Mr. Irvine, had reached out to Tackett's counsel, Mr. Posin, and advised they were ready to comply with the court's 30-day deadline to exchange the $20,000 payment for return of the turquoise ore. Plaintiffs' counsel asked Mr. Posin to coordinate with Tackett to schedule a time when they could access and inspect the turquoise and then arrange for transportation of the ore and return of the $20,000. Mr. Posin said he would contact Tackett and get back to Plaintiffs' counsel, but he did not do so. (ECF Nos. 130, 130-1, 130-2.)

The court stayed Plaintiffs' obligation to return the $20,000 payment at least pending a December 4, 2020 status conference, unless Tackett returned the turquoise ore before that time. (ECF No. 135.) Plaintiffs filed a supplemental status report on December 3, 2020, indicating continued efforts to arrange a date and time to inspect and pick up the turquoise in exchange for the $20,000, but had not heard back from Tackett or his counsel. (ECF No. 136.)

1    The court held a status conference on December 4, 2020. At that time, Mr. Posin advised

2  that his client had the turquoise in Flagstaff, Arizona, and was willing to exchange it in return for

3  the $20,000 check the following week. Mr. Posin represented that he would coordinate with

4  Plaintiffs' counsel for the transportation of the turquoise. The court ordered Posin to contact his

5  client no later than 5:00 p.m. on December 7, 2020, to arrange for the exchange to take place the

6  following week. The court explicitly cautioned Mr. Posin that if his client did not follow through,

7  he would be in violation of the court's order and may be subject to additional sanctions, which

8  could include imprisonment for contempt. (ECF No. 137.)

9    Plaintiffs filed a status report on December 8, 2020, indicating they had not heard

10  anything from Tackett or his counsel regarding scheduling the exchange, and asked the court to

11  find Tackett in contempt of the court's order. (ECF No. 138.)

12    On December 8, 2020, the court entered judgment in favor of Plaintiffs and against

13  Tackett, noting again that Plaintiffs are entitled to the return of the turquoise ore at Tackett's

14  expense. (ECF No. 141.)

15    On December 10, 2020, Plaintiffs filed a status report indicating that Mr. Posin emailed

16  Plaintiffs' counsel and provided the address where the ore was located, but did not provide a date

17  and time for the turquoise to be picked up. Plaintiffs' counsel emailed Mr. Posin and advised that

18  Mr. Harrington would arrive at the address provided on December 10, 2020, to inspect the ore,

19  and assuming it was in place, to arrange for the trucks to arrive on December 11, 2020, to pick

20  up the ore. When Mr. Harrington arrived at the location to inspect the ore on December 10, 2020,

21  however, Tackett would not grant him access to inspect the ore because Mr. Harrington "did not

22  have an appointment." Plaintiffs' counsel called and emailed Mr. Posin about the situation, but

23  did not hear back. (ECF No. 143.)

On December 11, 2020, the court held a video hearing to discuss Tackett's non-compliance with court orders to return the turquoise to Plaintiffs. The court ordered Tackett to attend by Zoom videoconference, but he did not appear, although his counsel at the time, Mr. Posin, did appear and confirmed he conveyed the court's order to his client. The court entered an order to show cause that Tackett explain why the sanction of contempt should not be entered against him for failing to comply with the court's orders to return the turquoise. Tackett was given until 5:00 p.m. on December 14, 2020, to do so. The court cautioned that it was within its power to impose a fine and/or imprisonment as a sanction if Tackett was found to be in civil contempt. (ECF No. 144.)

On December 11, 2020, Plaintiffs filed a status report indicating that Mr. Harrington telephoned Tackett that day to attempt to arrange for inspection, loading and shipment of the turquoise ore. Tackett claimed he had no idea that Mr. Harrington would be in Arizona to inspect and pick up the ore at that time and blamed his attorney, Mr. Posin, for failing to communicate that to him. Tackett also claimed he had fired Mr. Posin as his counsel that day. Tackett indicated Mr. Harrington could inspect the ore on December 13, 2020, at noon. (ECF No. 145.)

Tackett never filed a response to the order to show cause.

On December 15, 2020, the court issued an order finding Tackett in civil contempt of the court's orders to return the turquoise ore. The court ordered Tackett to reimburse Mr. Harrington for the losses he sustained in connection with his travel to Flagstaff, Arizona, to attempt to retrieve the turquoise ore.

In addition, the court gave Tackett until noon on December 18, 2020, to file a notice indicating that the turquoise had been returned to Plaintiffs, or the court would order his incarceration in Flagstaff, Arizona, until he complies with the court's orders. The court ordered

Mr. Posin to immediately serve a copy of the order on his client and contact him via telephone regarding the contents of the ore and file a notice of his compliance with this directive. (ECF No. 147.) Mr. Posin did not file the notice indicating he served his client with the order as directed. As a result, on December 16, 2020, the court ordered the U.S. Marshals Service to serve copies of ECF Nos. 136-141, 143-145, 147 on Tackett at his last known personal and business addresses. (ECF No. 148.)

On December 17, 2020, Plaintiffs filed another status report stating that Mr. Harrington was able to access the location where the turquoise ore was supposed to be stored, but the 130,000 pounds of turquoise ore that Plaintiffs sold to Tackett was contained in 45 "super sacks," and did not appear to be located that that facility. Instead, Tackett directed Harrington into an open lot with a row of plastic totes and Mr. Harrington maintains that this was not the turquoise ore that they sold to Tackett and inspected in 2018 and contained dirt and sand with little to no turquoise. In addition, the totes were open on top with snow on them, exposing the ore to elements which would degrade it. They asserted that Tackett remained in contempt of the court's orders and should be sanctioned. (ECF No. 152.)

On December 18, 2020, Mr. Posin filed a response to the court's contempt order, which attached a statement from Tackett. Tackett said that his counsel had not been informing him of his obligations to the court and had withheld documents and did not answer his requests. (ECF No. 155.)

The court held an emergency telephonic hearing on December 18, 2020, where both Mr. Harrington and Tackett were placed under oath. During the hearing, Mr. Posin admitted that he had provided some of the court's order to his clients, but not all, but believed he had telephone conversations with his client regarding the court's orders. Tackett maintained that the

ore transported in 2017 was the same turquoise ore currently on his property. Mr. Harrington testified about his inspection of the turquoise ore in 2018, and said that the turquoise ore he inspected on December 13, 2020, was not the same as that which was sold to Tackett. Ultimately, the court allowed Plaintiffs to perform a physical inspection, to be videotaped and photographed, of the turquoise ore at Tackett's facility. Mr. Harrington was permitted to dump out ore from the plastic totes and to use a shovel to remove the ore from the totes for inspection. The court declined to issue an order arresting Tackett for contempt given Mr. Posin's statement that he did not provide his client with all the court's orders. (ECF No. 159.)

On December 23, 2020, Plaintiffs filed a notice of inspection for the turquoise ore for December 28, 2020. (ECF No. 164.) Plaintiffs appeared for the inspection on that date, and this motion followed. Plaintiffs contend that the material they inspected on December 28, 2020, is unequivocally not the 130,000 pounds of No. 8 turquoise that they sold to Tackett. As a result, Plaintiffs seek to have the court hold Tackett in contempt of several of the court's orders, issue a bench warrant for his arrest, and direct that Tackett be incarcerated until he complies with the court's orders to return the ore to Plaintiffs.

## II. DISCUSSION

**A. Civil Contempt**

"A court of the United States shall have power to punish by fine or imprisonment, or both, at its discretion, such contempt of its authority, and none other, as – … (3) Disobedience or resistance to its lawful writ, process, order, rule, decree, or command." 18 U.S.C. § 401. The court also has inherent power to initiate contempt proceedings for disobedience of its orders. *Young v. United States ex rel. Vuitton et Fils S.A.*, 481 U.S. 787, 793-94 (1987).

Civil contempt "consists of a party's disobedience to a specific and definite court order by failure to take all reasonable steps within the party's power to comply." *Reno Air Racing Ass'n, Inc. v. McCord*, 452 F.3d 1126, 1130 (9th Cir. 2006) (quotation marks and citation omitted). It must be shown by clear and convincing evidence that the party "(1) … violated the court order, (2) beyond substantial compliance, (3) not based on a good faith and reasonable interpretation of the order[.]" *Labor/Cmty. Strategy Ctr. v. Los Angeles Cty. Metro. Transp. Auth.*, 564 F.3d 1115, 1123 (9th Cir. 2009) (citation and quotation marks omitted). Civil contempt should not be resorted to when "there is a *fair ground of doubt* as to the wrongfulness of the defendant's conduct." *Taggart v. Lorenzen*, 139 S.Ct. 1795, 1801-02 (2019) (quotation marks and citation omitted, emphasis original).

"The purpose of civil contempt is coercive or compensatory, whereas the purpose of criminal contempt is punitive." *Koninklijke Philips Elecs. N.V. v. KXD Tech., Inc.*, 539 F.3d 1039, 1042 (9th Cir. 2008) (citation omitted). Civil contempt sanctions are "designed to compel future compliance with a court order[.]" *Int'l Union, UMWA v. Bagwell*, 512 U.S. 821, 827 (1994). "The paradigmatic coercive civil contempt sanction … involves confining a contemnor indefinitely until he complies with an affirmative command such as an order 'to pay alimony, or to surrender property ordered to be turned over to a receiver, or to make a conveyance.'" *Id*. at 828 (citing *Gompers v. Bucks Stove & Range Co.*, 221 U.S. 418, 442 (1911)). "Imprisonment for a fixed term similarly is coercive when the contemnor is given the option of earlier release if he complies." *Id*. (citing *Shillitani v. United States*, 384 U.S. 364, 370, n. 6 (1966)). A per diem fine "imposed for each day a contemnor fails to comply with an affirmative court order" "exert[s] constant coercive pressure[.]" Fixed fines may be civil "when imposed and suspended pended future compliance." *Id.* at 829 (citation omitted). In these circumstances, the civil contemnor is

said to "carr[y] the keys of his prison in his own pocket," whereas the criminal contemnor "is

furnished no key, and he cannot shorten the term by promising not to repeat the offense." *Id.* at

828-29.

A court may wield its civil contempt power for two separate and independent purposes:

(1) "to coerce the defendant into compliance with the court's order"; and (2) "to compensate the

complainant for losses sustained." *United States v. UMWA*, 330 U.S. 258, 303-04 (1947).

A contemnor in violation of a court order may avoid a finding of civil contempt by

showing it took *all* reasonable steps to comply with the order. *Kelly v. Wengler*, 822 F.3d 1085,

1096 (9th Cir. 2016) (citation omitted, emphasis original). In addition, "[a]n alleged contemnor

may defend against a finding of contempt by demonstrating a present inability to comply."

*United States v. Ayres*, 166 F.3d 991, 994 (9th Cir. 1999).

"Because civil contempt sanctions are viewed as nonpunitive and avoidable, fewer

procedural protections for such sanctions have been required." *Id*. at 995 (citation and quotation

marks omitted). "Thus civil contempt may be imposed in an ordinary civil proceeding upon

notice and an opportunity to be heard. Neither a jury trial nor proof beyond a reasonable doubt is

required." *Id*. at 827 (citation and quotation marks omitted). The Ninth Circuit "has repeatedly

held … that finding a party in civil contempt without a full-blown evidentiary hearing does not

deny due process of law to a contemnor." *Id*. (citations omitted). While the Ninth Circuit has also

held that a court "ordinarily should not impose contempt sanctions solely on the basis of

affidavits," it noted that where "the affidavits offered in support of a finding of contempt are

*uncontroverted*, we have held that a district court's decision not to hold a full-blown evidentiary

hearing does not violate due process." *Peterson v. Highlands Music*, 140 F.3d 1313, 1324 (9th

Cir. 1996) (emphasis added). In addition, the Ninth Circuit has concluded that where the

"overwhelming evidence" supported the contempt motion and the alleged contemnor did not present a material issue of fact, due process is not violated when a hearing is not held. *Thomas, Head and Greisen Employees Trust v. Buster,* 95 F.3d 1449, 1459 (9th Cir. 1996) (contemnors presented no admissible evidence in response to the contempt motion and overwhelming evidence supported the request).

The Ninth Circuit also relied on a Seventh Circuit opinion finding no denial of due process where an evidentiary hearing was not held when the evidence was "more than sufficient to establish the contemptuous conduct," the party failed to demand such a hearing" and did not create any material issue of fact. *Id.* at 1459 (quoting *Commodity Futures Trading Comm'n v. Premex, Inc.*, 655 F.2d 779, 782 n. 2 (7th Cir. 1981)).

As will be discussed in greater detail below, the court finds it is unnecessary to hold an evidentiary hearing because Tackett received notice of the motion to hold him in contempt and an opportunity to respond, he did not request a full-blown evidentiary hearing, the Plaintiffs' evidence that Tackett has violated the court's orders to return the turquoise ore is overwhelming, and Tackett failed to present a declaration or other evidence sufficient to raise a material dispute as to whether he is in contempt of the court's orders.

**B. Tackett is in Contempt of the Court's Orders to Return the Turquoise Ore to Plaintiffs**

According to Plaintiffs, in August of 2017, they loaded the approximately 130,000 pounds of turquoise ore into 45 super sacks, and the ore was in those sacks when it was shipped from their property in Nevada to Tackett's facility in Arizona. (Daniel Harrington Decl., ECF No. 165-1 ¶ 3.) Those super sacks were full of mostly larger pieces of turquoise, with only 10-30% of each bag consisting of small pieces. Daniel Harrington personally screened several super sacks. (*Id.* ¶ 13; ECF Nos. 165-2, 165-3 (photos of the ore as shipped to Tackett); Elkins Decl.,

ECF No. 165-10 ¶ 4.) Steve Harper states that the super sacks Plaintiffs provided to Tackett were full of chalk turquoise, and he thought about sixty percent of it was usable, with pieces the size of a softball down to small pieces. (Harper Decl., ECF No. 165-11 ¶ 3.)

In 2018, Plaintiffs conducted an inspection of the turquoise ore, and at that time Daniel Harrington confirmed that the ore was in the original 45 super sacks and all 45 sacks were accounted for, and the sacks looked "like new." (Harrington Decl., ECF No. 165-1 ¶ 4; ECF No. 165-4 (photos of the ore inside the facility taken during the 2018 inspection.)

Mr. Harrington went to Tackett's property in Flagstaff, Arizona on December 13, 2020, to inspect the 45 super sacks containing the 130,000 pounds of turquoise ore that they had sold to Tackett to confirm the location and condition of the ore prior to ordering trucks and a forklift to take possession of the ore. Instead of going inside the facility where the 45 super sacks were previously stored, Tackett directed him to an open lot and a row of plastic totes. Apparently, the material from the super sacks had been removed and placed into the totes. According to Mr. Harrington, the totes contained virtually no turquoise, except for a small pile that had been placed on top of dirt and gravel. He dug down into the totes, but there was no additional turquoise below the surface. Tackett told him he had removed the ore from the super sacks because the super sacks had deteriorated. (Harrington Decl., ECF No. 165-1 ¶¶ 5-9; ECF No. 165-5 (photos of the plastic totes stored outside on Tackett's property on December 13, 2020).)

After the December 18, 2020 hearing before the court, Mr. Harrington went back to Tackett's facility, with Jack Elkins and Steve Harper, to inspect the totes again. The inspection revealed there were 28 totes stored outside at Tackett's facility that contained mostly dirt and gravel, with small piles of turquoise on the top of the dirt and gravel. They dug down into the totes, but the inspection did not reveal any additional turquoise. (Harrington Decl., ECF No. 165-

1 ¶¶ 11-12, 14, 19-20; Exhibits 6-10, 12-13, 15 (DVD containing videos of the inspection filed

manually with the court); Elkins Decl., ECF No. 165-10 ¶¶ 6-8; Harper Decl., ECF No. 165-11

¶¶ 6-9.) The videos show plastic totes with dirt and then a small pile of larger rocks on top, and

most of the totes are not close to full.

According to Elkins, each of the plastic totes had red cinders that are commonly found in

the soil around Flagstaff, and there were also five-gallon buckets of red cinders near where the

ore was located. (Elkins Decl., ECF No. 165-10 ¶ 9.)

Plaintiffs have provided photographs of the ore as it appeared when they packed it at their

property in Nevada to be transported to Tackett's facility in Arizona in August of 2017 that show

the sacks containing large pieces of ore, and compare those to photographs and video of the

material in the plastic totes at Tackett's facility in December of 2020. According to Plaintiffs, the

material in the plastic totes appears to have been strained down to a size of ½ inch or less.

(Harrington Decl., ECF No. 165-1 ¶ 21; Elkins Decl., ECF No. 165-10 ¶ 9.)

Plaintiffs further contend that the raw volume of material contained in the plastic totes is

far less than the volume of turquoise ore they sold to Tackett. The super sacks they used to hold

the turquoise they sold to Tackett measure 35" x 35" x 50". Plaintiffs contend that they hold

between 42 and 45 cubic feet each. (Harrington Decl., ECF No. 165-1 ¶ 23; ECF No. 165-14

(super sack labels).) The plastic totes used to hold the material at Tackett's facility, by contrast,

hold about 35 cubic feet per tote, and the totes were not filled to the top. (*Id*. ¶ 24.)

Insofar as Tackett claims that he moved the ore from the super sacks to the totes because

they had been degrading, Plaintiffs note that they found a pile of super sacks discarded on

Tackett's property which appeared in good condition, but had been cut open at the bottom to

1  release the contents. (Harrington Decl., ECF No. 165-1 ¶ 25; Elkins Decl., ECF No. 165-10 ¶ 11;

2  Harper Decl., ECF No. 165-11 ¶ 11; ECF No. 165-16 (photo of discarded super sacks).)

3         In his response, Tackett argues that the material is the same as that which he was sold and

4  has just degraded, showing a lack of quality. He refers to a declaration that Elven Jennings made

5  in court stating that the only thing left in Fay Ward's warehouse was dirt and poor-quality stone

6  that was not worth transporting. He contends that the 45 super sacks of rock he was sold did not

7  resemble the original sample bag that Plaintiffs had brought to Flagstaff.

8         Tackett claims the material he was sold broke down to gravel and dirt after sitting for

9  several years because the rock is sensitive to moisture. Tackett explains that the turquoise only

10  came out of the indoor storage on the property when he had to rent out space in the building.

11  When he was moving the super sacks to the outdoor storage space, he found that the super sack

12  bags were damaged and became brittle and many ripped apart when moving them. As a result,

13  Tackett purchased the large plastic containers to transfer the material to. He states that when the

14  super sacks were opened, only the top portions contained any sizeable rock.

15         Tackett also contends that the original sample bag of ore that Harrington brought to

16  Tackett was screened by both of them, and they found that only 10-30% of the bag contained

17  turquoise, and the rest consisted of dirt and sand.

18         With respect to the number of plastic totes, Tackett says that on December 28, 2020, he

19  believed he had grouped all the totes together on the property, but afterwards realized there were

20  still six totes on the property that had been moved: two on the westside of the warehouse; two in

21  the parking lot; and two by a shade structure on the property.

22         Tackett also argues that Plaintiffs miscalculate the volume and weight of the material that

23  was originally transported, and maintains that what was transported to him is the same as the 34

totes at his property (the 28 Plaintiffs saw and the 6 Tackett claims he overlooked). He also now disputes whether there was 130,000 pounds of turquoise originally shipped to him, asserting that tandem axle trucks have a maximum weight restriction of 34,000 pounds per truck under NRS 484D.635(1)(b). Tackett states that the trucks had to go through a weigh station and none of them tripped the scales as being overweight. He goes on to assert that one of the super sacks in a photo was labeled by Harrington as weighing 2100 pounds. As such, if all 45 super sacks weighed that much, the total would be 94,500 pounds, and not 130,000 pounds. He further claims that not all the super sacks were full.

Next, Tackett states that Plaintiffs incorrectly calculated the volume the super sacks could hold at 45 cubic feet, because cubic feet are measured by multiplying the length, height, and width, and divided by 1728 (because there are 1728 inches in a cubic foot). According to Tackett, a full super sack measuring 35 x 35 x 50 would therefore have a volume of 35.44 cubic feet.

Tackett also argues that each plastic tote is much larger than the super sacks, and contains about one and a half super sacks of the material. He contends the totes can hold 51 cubic feet if full.

Insofar as Elkins discussed the red volcanic cinders in the materials, Tackett says that they are used in small quantities on the property and sidewalks to provide traction when it is icy, and they would not have been in the totes.

In response to Plaintiffs' contention that the discarded super sacks were not degraded, Tackett states that the super sacks were stored in a building with an all-glass side which allowed harmful UV rays to degrade the tops of the bags where the handles are placed to move them.

1  Tackett says when he tried to lift the bags by the tops and found they could not be lifted by the

2  straps, the only way to move them was to cut them along the sides and scoop them into the totes.

3      Tackett also argues that the declarations of Elkins and Harper should not be considered

4  because they are biased because they were part of another lawsuit involving Tackett. He

5  contends that they lied about seeing the rock after it was first delivered to Tackett.

6      In their reply, Plaintiffs maintain that the 45 super sacks that left their Nevada property

7  for Tackett's Arizona property were all good quality ore with some very limited gravel and dirt.

8  (Harrington Decl., ECF No. 172-1 ¶ 2-3.) When the 45 super sacks left their facility, they were

9  stored on pallets when they were loaded onto the trucks. (*Id.*) In addition, Plaintiffs reiterate that

10  they acquired the turquoise ore when they purchased real property in Crescent Valley, Nevada,

11  from the Ward Family, and the turquoise was located inside a warehouse they purchased and

12  consisted of large piles of turquoise ore in rock/chalk form. These piles of ore went directly into

13  the super sacks with no sorting or screening. (*Id.* ¶ 4.) Plaintiffs provide photos of the ore in the

14  warehouse before being placed into the super sacks, which show large piles of ore with big and

15  small pieces of rock and little dirt/gravel. (ECF No. 172-2 at 2-3.)

16      When he conducted the 2018 inspection, Mr. Harrington confirmed the ore was still in

17  the 45 super sacks that looked like "new" and all the super sacks remained on pallets. (*Id.* ¶ 5.)

18  He provides photographs showing the super sacks in 2018, which mostly appear to be full,

19  containing large rock pieces, and the sacks are on pallets. (ECF No. 172-3 at 2-6.)

20      Insofar as Tackett argues that the material has deteriorated due to exposure to weather,

21  Defendants provide a satellite image of Tackett's property that shows the plastic totes were not

22  outside as of August 13, 2020, and therefore could have only been outside a few months before

23  the December 13, 2020 inspection. (ECF No. 172-4.) In addition, during that time period,

1  Flagstaff only received any significant precipitation on November 8, 2020, and the temperature

2  there only reached freezing about a month before the inspection. (ECF No. 172-5.)

3      In addition, Plaintiffs contend they have some rock/chalk turquoise of low quality that

4  has been discarded at their property in Nevada, and has been outside and exposed to the elements

5  for over four years and is still in good condition with only limited degradation. (Harrington

6  Decl., ECF No. 172-1 ¶ 9; ECF No. 172-6 (photos of the turquoise ore after four years of

7  exposure to the elements).)

8      With respect to Tackett's contention that he forgot about six other totes, Mr. Harrington

9  says that Tackett never mentioned any other totes and instructed Mr. Harrington not to go further

10  than 100 feet from the totes. (Harrington Decl., ECF No. 172-1 ¶ 10.) Mr. Harrington did see

11  additional *empty* totes on Tackett's property, including several that were next to the 28 totes, and

12  others on the west side of the property. (*Id*. ¶ 11; ECF No. 172-7 (photographs of empty totes on

13  the west side of Tackett's property, and empty totes stacked beside the 28 they inspected.)

14      Mr. Harrington conducted further research about the volume of the super sacks with

15  dimensions of those sold to Tackett (35" x 35" x 50"). He located identically sized super sacks

16  on two additional websites, with one stating that the volume is 43.1 cubic feet, and the other is

17  42 cubic feet. (*Id*. ¶ 12; ECF No. 172-8, specifications of the two other super sacks that are the

18  same size as those sold to Tackett.) In 2017, when Mr. Harrington bagged the turquoise ore into

19  super sacks to ship to Tackett, he weighed many of them, and the average weight was around

20  2500 pounds, with 2100 pounds being the smallest sack, and some sacks weighed nearly 3000

21  pounds. (*Id*. ¶ 13.)

22      Plaintiffs still have three super sacks of the turquoise ore in their possession, and all

23  together they weigh approximately 8000 pounds. They are close to full, but not completely full,

16

1   and the same was true of the sacks sent to Tackett. (*Id.* ¶ 14.) Plaintiffs took one of the super

2   sacks in their possession (which weighed 2552 pounds), and transferred the contents of that sack

3   into a plastic tote of the identical size of those used by Tackett. The super sack was

4   approximately 85 % full before its contents were dumped into the tote, and it filled the 275-

5   gallon plastic tote. (*Id.* ¶¶ 14-15.) Plaintiffs include photographs of this demonstration.

6   (ECF No. 172-10.)

7        After reviewing the briefing and evidence submitted, the court finds there is clear and

8   convincing evidence that Tackett is in violation of: the stipulation and order to maintain the

9   approximately 130,000 pounds of No. 8 turquoise in the covered storage area at his business in

10   Flagstaff, Arizona (ECF No. 20); and the order granting partial summary judgment in favor of

11   Plaintiffs which ordered Tackett to return the turquoise ore to Plaintiffs (ECF No. 124).[2]

12        Plaintiffs have presented declarations, photographic and video evidence demonstrating

13   that they sold Tackett 45 super sacks that were mostly full of No. 8 turquoise ore, and that those

14   super sacks remained in similar condition when Plaintiffs inspected them in 2018. In contrast, the

15   28 plastic totes Tackett showed Plaintiffs in December of 2020 contain mostly dirt and gravel

16   with small piles of turquoise ore on top and are not the same as what was sold to Tackett in 2017.

17        Tackett provides no declaration to support his position, and even though he is proceeding

18   pro se, he has filed declarations to accompany his filings in the past. He provides a few

19

20

21        [2] At this point, it is unclear what Tackett has done with the approximately 130,000

22   pounds of No. 8 turquoise ore from the Plaintiffs, and so the court cannot conclude that he is in
   violation of the stipulated preliminary injunction not to *dispossess* any of that turquoise. (ECF

23   No. 77.) What is clear is that Tackett has not returned or made available for pick up and transport
   the ore that was originally sold to him.

photographs as evidence, but, as will be discussed, they do not substantiate his position. Instead, his arguments and statements are entirely unsupported by any evidence.

In his opposition, Tackett asserts that he did not actually receive 130,000 pounds of turquoise ore from Plaintiffs in 2017; however, Tackett has stipulated that this case relates to approximately 130,000 pounds of No. 8 turquoise, and that he *took possession of the approximate 130,000 pounds of No. 8 turquoise*. (ECF No. 20.)

Tackett provides a photograph of what he asserts is the screened turquoise from the sample super sack that Harrington brought to Flagstaff in 2017. (ECF No. 181 at 13.) Even if that photograph depicts the "only" turquoise that was screened from the sample super sack, that is definitively *much more* than the small piles contained on top of the 28 plastic totes that are otherwise filled with dirt and gravel outside on Tackett's facility in December of 2020.

Tackett also argues that Plaintiffs could not have sold him 130,000 pounds of material because the trucks had a weight-capacity of 34,000 pounds each under Nevada law, and the trucks did not trip the scales as being overweight; however, Tackett provides no evidence that the trucks went through any scales or what the results were.

Tackett points out that one of the super sacks was marked as weighing 2100 pounds, and argues that if all the sacks weighed that amount, it would not equal 130,000 pounds, but Tackett provides no evidence that *each* of the sacks weighed only 2100 pounds. There is a declaration from Mr. Harrington, however, stating that the average weight of the sacks was around 2500 pounds, with some weighing as little as 2100 pounds, and some weighing nearly 3000 pounds.

Tackett provides a photograph of a semi-truck transporting a number of super sacks, to support his contention that there could not have been 130,000 pounds of turquoise ore. (ECF No. 171 at 15.) This photograph shows numerous very large super sacks on top of pallets on a semi-

truck, but it does not show *all* the sacks that he acknowledges were placed on the other two trucks. Nor does this demonstrate the weight of *all* the super sacks.

Tackett submits a photo of what he says are super sacks after they were unloaded from the three trucks in August of 2017, which Tackett claims shows the super sacks were not full. (ECF No. 171 at 17.) This, however, is a poor-quality photo that is dim and one certainly cannot tell from that photo the fullness of each of the sacks.

Tackett contends that Plaintiffs did not correctly calculate the volume of the super sacks, advancing his own method, without any support that this was in fact the volume of the super sacks used. Plaintiffs, on the other hand, provide specification sheets of three different super sacks with the same measurements as those used here, which provide for a volume of between roughly 42 and 45 cubic feet.

Tackett also argues that the lack of volume in the 28 totes can be attributed to the fact that there were six more totes on the property that he forgot to show Plaintiffs. Mr. Harrington provides a declaration that he observed other empty plastic totes on the property, but none that had material in them. In any event, it seems suspect that Tackett would not show Plaintiffs all the material when directed by a federal court to conduct an inspection of the turquoise ore at issue. Moreover, Tackett does not provide a declaration, photographic or video evidence of the existence of the additional plastic totes or their contents.

Tackett references a statement by Elkins that all that remained in Fay Ward's warehouse was dirt and poor-quality stone that was not worth transporting, but does not provide the court with the document containing that statement or a citation as to where it can be found. Plaintiffs, on the other hand, provide a declaration and photographs depicting the No. 8 turquoise ore that was in the property they bought from the Ward Trust. Moreover, Tackett's description of the

No. 8 Turquoise as poor-quality is contradicted by his agreement to pay $300,000 plus a percentage of future sales for that material.

Insofar as Tackett claims that the super sacks were moved because they were degraded so they could not be lifted by the handles, Plaintiffs point out that the super sacks were stored on pallets, and so the handles would not have had to be used to move them, but only the pallets would need to be moved. Tackett provides no evidence to support his assertion that the super sacks were in fact degraded, and the evidence presented by Plaintiffs shows the discarded super sacks to be in fine shape other than the bottoms being sliced open to empty their contents.

Finally, Tackett argues that Elkins, Harper and Harrington are biased against him and should not be believed, but the only support he provides for this statement is the fact that they are involved in a lawsuit against him. While Tackett claims that Elkins and Harper could not have seen the turquoise after it arrived at his facility, he again provides no support for this assertion.

For these reasons, the court finds clear and convincing evidence exists to find Tackett in civil contempt of the court's orders to return the 130,000 pounds of turquoise ore to Plaintiffs. The court finds that coercive imprisonment is an appropriate sanction since Tackett has failed to pay past monetary sanctions imposed against him.

### III. CONCLUSION

Tackett is again found to be in civil contempt of this court's orders to return the approximately 130,000 pounds of turquoise ore to Plaintiffs. Tackett has until **noon on August 11, 2021**, to file a notice advising the court and Plaintiffs of the location of the 130,000 pounds of turquoise ore sold to him by the Plaintiffs. If Tackett does not do so, the court will immediately issue a warrant for his arrest and have him incarcerated in Flagstaff, Arizona, until he complies with the court's orders to purge his contempt. Should Tackett be incarcerated, he

"holds the keys" to the jailhouse in that he can end his incarceration by providing the court with information concerning the whereabouts of the turquoise ore that is the subject of this action. If Tackett is incarcerated, within seven days of his incarceration, the court will hold a hearing to evaluate his ability to purge his contempt.

**IT IS SO ORDERED**.

Dated: July 28, 2021

William G. Cobb
United States Magistrate Judge